UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

| | |
|---|---|
| KEVIN M. WARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:13-CV-12 (CEJ) |
| ) | |
| CAROLYN W. COLVIN,[1] Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On March 2, 2009, plaintiff Kevin M. Ward filed applications for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of January 1, 2006. (Tr. 164-70). After plaintiff's applications were denied on initial consideration (Tr. 48-50, 63-72), he requested a hearing beforean Administrative Law Judge (ALJ). (Tr. 75-76).

Plaintiff and counsel appeared for a hearing on June 5, 2012. (Tr. 27-47).[2] On August 17, 2012, the ALJ issued a decision finding that plaintiff was not disabled through the date he was last insured. (Tr. 12-20). The Appeals Council denied

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), she is substituted for Michael J. Astrue as the defendant in this case.

[2]Plaintiff was initially scheduled to appear for a hearing on November 25, 2009, via video teleconference. (Tr. 83-106). However, on November 17, 2009, plaintiff's counsel filed requests for an in-person hearing. (Tr. 109-11). Counsel was instructed to appear at the hearing but did not do so, and the ALJ dismissed the request for hearing. (Tr. 298, 51-55). The Appeals Council remanded on April 1, 2011. (Tr. 57-58). On July 7, 2011, plaintiff again requested an in-person hearing. (Tr. 120).

plaintiff's request for review on December 4, 2012. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In his Disability Report (Tr. 210-20), plaintiff listed his disabling conditions as diabetes, bipolar disorder, depression, anxiety, mood disorder, numbness in his feet, and blurred vision. He stated that he could "do less and less" and often did not leave the house. (Tr. 211). Work and social environments caused him stress and he could not cope with people. He suffered from mood swings and outbursts, and often felt anxious and depressed. Plaintiff was prescribed Novolin to treat diabetes and Celexa to treat his bipolar disorder, depression, and anxiety. (Tr. 217).

Plaintiff reported that he worked as a laborer for a manufacturer for one month in 1999 and was self-employed as a laborer from 2001 through 2004. (Tr. 221). After his alleged onset date of January 1, 2006, plaintiff had four brief periods of employment as a cook and as a laborer. Some of these positions required him to stand and walk all day and lift up to 50 pounds. See, e.g., Tr. 222 (describing activities for 2008 cook position). Plaintiff had recorded earnings each year between 1996 and 2011, never earning more than $5,200 in a single year.[3] (Tr. 187).

Plaintiff completed a Function Report on August 16, 2009. (Tr. 238-48). His daily activities included watching television, cleaning house, taking a nap, visiting with friends, and looking for employment. He ate three meals a day and checked his blood sugar levels throughout the day. He took care of his pets and occasionally watched

---

[3]A detailed earnings query lists 37 periods of employment between 1996 and 2008. (Tr. 181-86).

friends' children. He spent between 1 and 3 hours cooking for himself every day, and was able to clean his house and do outside work. As a result of his illnesses he could no longer stand on his feet for long periods of time and was afraid of going out in public. He needed reminders to take his medicine and keep his appointments. He did not have a valid driver's license and so walked or was driven. He went shopping once a month to buy food and clothes. He was able to pay bills, handle a checkbook and savings account, and count change. His hobbies included video games, fishing, drawing, and enjoying the outdoors, but he was too depressed and anxious to go anywhere. He spent time with others once or twice a week, but only in someone else's home. Plaintiff had difficulties with standing, climbing stairs, squatting, walking, kneeling, seeing and getting along with others. He could walk for about an hour before needing to rest for 10 to 15 minutes. He could follow written and spoken instructions very well. He was fired for arguing with co-workers and did not handle stress or changes in routine well. He worried that people were talking about him or trying to hurt him.

Melissa Lynn Dunning and Lena Thomas completed Third Party Function Reports. (Tr. 249-57, 294-96). Ms. Dunning stated that plaintiff lived in her home, formerly as her boyfriend, but presently as a friend. Her statements were consistent with those plaintiff made in his report. Ms. Thomas stated that plaintiff always thought that people were talking about him and became nervous and agitated. He would become depressed and his diabetes suffered. He had difficulty walking because of pain in his legs.

### B. Hearing on June 5, 2012

Plaintiff was 31 years old and unmarried at the time of the hearing. He graduated from high school. He had a six-year-old son who was in foster care at the time of the hearing but was expected to be returned to his mother's custody. (Tr. 31). Plaintiff was in jail between December 2010 and March 2011 on charges of domestic assault. (Tr. 35).

In late 2006, plaintiff worked 30 hours a week as a cook and dishwasher. (Tr. 16, 33). From July to August 2007, he worked 40 hours a week as a laborer. (Tr. 16). He lost this job when he had to be hospitalized. (Tr. 34); see also Work Activity Report (indicating plaintiff left this job due to his medical condition). (Tr. 198). He worked 20 hours a week as a cook from October to November 2007. In 2008, he worked as a cook at a dinette until June 24, 2008, when he was let go for missing work due to his medical condition. (Tr. 34, 185, 197). His last position was as a cook in August 2011. That job ended because the business closed. (Tr. 32).

Plaintiff was in jail between December 2010 and March 2011 on an assault charge. (Tr. 35). Plaintiff testified that this was the only time he had been in jail since January 2006; however, medical records show that he had hospital admissions in September 2008 and February 2010 as a result of not receiving his insulin while "in jail." (Tr. 355, 748).

Plaintiff testified that he was first diagnosed with Type I diabetes in September 1993 and had been on insulin ever since. (Tr. 36). He experienced diabetic ketoacidosis at least once or twice a week but was generally able to control it. If his efforts did not succeed in lowering his blood sugar, he sought treatment at the emergency room. (Tr. 46). This occurred every one or two months. There was no indication that plaintiff was failing to follow his diet or medication regimen. (Tr. 37-

38). Plaintiff testified that he had always experienced episodes of high blood sugar levels and that his condition had deteriorated over time. In particular, his eyesight and neuropathy had worsened. (Tr. 39).

Plaintiff testified that he was first hospitalized for psychological problems when he was 15. (Tr. 40). In 2007 or 2008, he was hospitalized again and diagnosed with bipolar disorder. His symptoms included feeling depressed and wanting to hurt himself or someone else. He attended outpatient treatment for three or four sessions but had to stop when his funding ran out.

In addition to medication for treatment of diabetes, plaintiff was prescribed Lamictal for bipolar disorder, Wellbutrin, Seroquel, and Celexa for mood disorders, and Neurontin for neuropathy. (Tr. 37).

Bob Hammond, a vocational expert, provided testimony regarding the employment opportunities for a younger individual under the age of 50 with a 12th grade education, who was limited to light work, and needed to avoid exposure to extreme heat, unprotected heights, and moving machinery, and who should have no more than superficial interaction with co-workers and supervisors. (Tr. 42-43). Mr. Hammond opined that such an individual would be able to perform work as an assembler. However, a worker could not be absent from these jobs more often than 1.5 days a month following a probationary period of 90 days. Before 90 days, a worker would not be allowed any absences. (Tr. 44).

### C. Medical Records

In January, February, June, and August 2005, and in May 2006, plaintiff had blood tests and diagnostic scans at the Hannibal Regional Hospital emergency room. (Tr. 444-72). The results of those tests were printed in 2009 and are included in the

record, but the underlying treatment notes are absent. On these occasions, plaintiff was treated for high glucose levels and, occasionally, abdominal pain.

On September 22, 2006, plaintiff was hospitalized for treatment of diabetic ketoacidosis, secondary to gastroenteritis with volume depletion. (Tr. 417-43). He reported that he had had flu-like symptoms for two or three days and that his girlfriend had similar symptoms. (Tr. 423). He had been feeling ill for about a month, with coughing, sneezing and abdominal pain. He could not afford regular medical treatment and did not have a physician. (Tr. 420).

Plaintiff next received medical care in June 2007, when he was again admitted to the hospital with abdominal pain. (Tr. 391-416). Plaintiff reported that he had not had any episodes of diabetic ketoacidosis since his last admission in September 2006, despite failing to follow through with outpatient treatment as recommended. (Tr. 394, 397). It was noted that he had had pancreatitis in the past. (Tr. 391). On June 11, 2007, plaintiff was diagnosed with biliary dyskinesia and underwent laparoscopic removal of his gallbladder. (Tr. 400-01, 410). At a postoperative follow-up appointment on June 18, 2007, plaintiff reported vast improvement in his symptoms. (Tr. 338).

The medical record contains laboratory reports for treatment plaintiff received in the emergency room in March 2008 (Tr. 386-89 -- showing elevated blood sugar levels); April 2008 (Tr. 382-83 -- presented with nausea and vomiting; had elevated blood sugar levels); June 2008 (Tr. 381 -- x-ray of right foot following a fall); August 1, 2008 (Tr. 597 -- laceration to right knee); and August 31, 2008 (Tr. 378-80 -- elevated blood sugar levels). The treatment notes for these admissions are not included in the record.

On September 1, 2008, plaintiff was involuntarily admitted to the Metropolitan St. Louis Psychiatric Center after making suicidal statements in the midst of a family dispute. (Tr. 341-50). On admission, he was sluggish, evasive about drug use, negativistic and frustrated. (Tr. 341). He had no prior psychiatric contact. (Tr. 344). Plaintiff reported that he had significant anger problems, but denied that he ever wanted to kill himself. Plaintiff's diagnoses at discharge were depression, not otherwise specified; cannabis abuse; and personality disorder, not otherwise specified; and a Global Assessment of Functioning (GAF) score of 65. (Tr. 350). Plaintiff was discharged with a prescription for the antidepressant Citalopram. (Tr. 349). Plaintiff kept two outpatient counseling sessions at the Mark Twain Behavioral Health Center. (Tr. 474, 475).

Plaintiff was admitted to the hospital for treatment of diabetic ketoacidosis on September 24, 2008. (Tr. 354-69). He had been in a fight the night before and was treated at the emergency room for a knife cut to his neck before being taken to jail. (Tr. 358). He did not receive any insulin for 24 hours and became ill. He was returned to the emergency room.

Plaintiff began receiving outpatient treatment at the Hannibal Free Clinic. (Tr. 481-83; 478-79). He had a number of hospital admissions for treatment of diabetic ketoacidosis in 2009 and 2010. See e.g., Tr. 510-84; 666-67; 659-63. He also started reporting more psychiatric symptoms, including panic attacks. See, e.g., Tr. 677, 739, 733.

On April 8, 2009, Marsha Toll, Psy.D., completed a Psychiatric Review Technique. (Tr. 488-502). Dr. Toll concluded that plaintiff had medically determinable diagnoses of depression not otherwise specified, personality disorder not otherwise specified, and

cannabis abuse. Plaintiff had moderate difficulties in maintaining concentration, persistence or pace and one or two episodes of decompensation. In a narrative section, Dr. Toll noted that plaintiff did not receive any psychiatric treatment between his alleged onset date, January 1, 2006, and his last date of insured status, June 30, 2008. (Tr. 498). She found that plaintiff retained the ability to understand, remember and carry out simple instructions, maintain adequate attendance and sustain an ordinary work routine without special supervision, interact adequately with peers and supervisors in a setting with limited demands for social interaction, and adapt to minor changes in the work setting. (Tr. 502).

### III. The ALJ's Decision

In the decision issued on August 17, 2012, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2008.

2. Plaintiff has not engaged in substantial gainful activity since January 1, 2006, the alleged onset date.

3. Since the alleged onset date, plaintiff has the following severe impairments: diabetes mellitus Type I, depression, and personality disorder.

4. Since the alleged onset date, plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Prior to August 31, 2008, plaintiff had the residual functional capacity to perform lift and carry 10 pounds frequently and 20 pounds occasionally. He had the capacity to sit, stand, and walk 6 hours of an 8-hour workday. He could not work in environments with prolonged exposure to extreme heat and could not work around unprotected heights or moving equipment. He was limited to superficial interactions with co-worker and supervisors (meaning no negotiation, confrontation, arbitration or supervision of others) and could have no direct interaction with the general public.

6. Beginning on August 31, 2008, plaintiff had the same residual functional capacity described above, but in addition would be absent more than one and one half days per month on average per year.

7. Since January 1, 2006, plaintiff has been unable to perform any past relevant work.

8. Prior to the established disability onset date, plaintiff was a younger individual.

9. Plaintiff has at least a high school education and can communicate in English.

10. Prior to August 31, 3008, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled" whether or not plaintiff has transferable job skills. Beginning on August 31, 2008, plaintiff has not been able to transfer job skills to other occupations.

11. Prior to August 31, 2008, considering plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

12. Beginning on August 31, 2008, considering plaintiff's age, education, work experience and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that plaintiff can performed.

13. Plaintiff was not disabled prior to August 31, 2008, but became disabled on that date and continued to be disabled through the date of the decision.

14. Plaintiff was not under a disability within the meaning of the Social Security Act at any time through June 30, 2008, the date he was last insured.

(Tr. 14-19).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so

that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative

assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ erred in establishing the disability onset date; incorrectly determined plaintiff's residual functional capacity (RFC) prior to the disability onset date; and made errors in his credibility determination.

### A. Disability Onset Date

The ALJ determined that plaintiff's disability onset date was August 31, 2008, two months after the expiration of insured status on June 30, 2008. Plaintiff argues that the ALJ failed to follow Social Security Ruling 83-20 (SSR 83-20) in determining the onset date of disability. See Titles II & XVI: Onset of Disability, 1983-1991 Soc.Sec.Rep.Serv. 49, 1983 WL 31249 (S.S.A. 1983).

In order to receive disability insurance benefits, a claimant must show the onset of disability before the expiration of insured status. Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998). SSR 83-20 is a statement of the policy and process for determining the onset date of disability, and enumerates a number of factors to be considered, including a claimant's allegations, work history, and medical evidence. Schmick v. Astrue, 1:07CV69 HEA, 2008 WL 4402204, at *14 (E.D. Mo. Sept. 24, 2008) (citing SSR 83-20 at *1).

> In disabilities of nontraumatic origin, the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case.
>
> 1. Applicant Allegations: The starting point in determining the date of onset of disability is the individual's statement as to when disability began. . .
>
> 2. Work History: The day the impairment caused the individual to stop work is frequently of great significance in selecting the proper onset date. . .
>
> 3. Medical and Other Evidence: Medical reports containing descriptions of examinations or treatment of the individual are basic to the determination of the onset of disability. The medical evidence serves as the primary element in the onset determination. . .

SSR 83-20 at *2.

> Particularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (*i.e.*, be decided on medical grounds alone) before onset can be established. In such cases, consideration of vocational factors can contribute to the determination of when the disability began. . .
>
> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

SSR 83-20 at *2-3.

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

Id. at *3.

Plaintiff alleged disability beginning on January 1, 2006. The ALJ properly discounted this date of onset after reviewing the treatment record, as there was no evidence of medical treatment related to plaintiff's disabling conditions until September 2006 when he was hospitalized for diabetic ketoacidosis secondary to viral gastroenteritis. "[T]he individual's allegation [of date of onset] . . . is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence." Id. at *1.

Plaintiff argues that the ALJ ignored medical evidence that is relevant to determining his onset date. In particular, he argues that the ALJ should have considered the significance of his elevated blood sugar levels in March and April 2008. Defendant contends that the ALJ properly addressed the occasional high blood sugar levels by including environmental restrictions in the RFC determination. This argument misses the point. The blood tests were taken in the course of admissions to the Hannibal Regional Hospital emergency department, but there is no information regarding plaintiff's presenting complaints or the diagnostic impression, and it is not possible to know how serious plaintiff's medical condition was at the time of these admissions. Furthermore, the sole difference between plaintiff's RFC before and after August 31, 2008, is the number of days per month plaintiff was likely to be absent from work. Compare Tr. 15 and 17. The ALJ found that plaintiff "visited the hospital

more often" after August 2008 and that, "by August 31, 2008, the [plaintiff's] conditions required a great deal more treatment, which translates to more absenteeism at the work place." Tr. 17-18. But, there is evidence that plaintiff had hospital treatment before August 31, 2008. Furthermore, plaintiff stated that he lost employment on June 24, 2008, because of his medical condition. (Tr. 34, 197). Plaintiff's absenteeism was the determinative factor in the ALJ's decision regarding the onset of disability and it was error not to address the records from March and April 2008. Consequently, this matter must be remanded. On remand, the ALJ should also address the records from 2005 and May 2006.

On remand, it may be necessary to obtain additional medical records or an expert opinion. "If the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83–20 requires the ALJ to call upon the services of a medical advisor to insure that the determination of onset is based upon a 'legitimate medical basis.'" Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997). See also DeLorme v. Sullivan, 924 F.2d 841, 848 (9th Cir. 1991) ("In the event that the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83–20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.")

Plaintiff also argues that he was disabled due to his mental illness before August 31, 2008. There is no evidence of inpatient or outpatient treatment before his involuntary commitment on September 1, 2008. Plaintiff testified that he had been diagnosed with bipolar disorder at age 15, but he denied prior psychiatric treatment during his admission to the Metropolitan St. Louis Psychiatric Center. The ALJ's

determination that plaintiff's mental health was not disabling before August 31, 2008, is supported by substantial evidence in the record.

### B. The RFC Determination and Credibility Assessment

Plaintiff's challenges to the ALJ's RFC determination and credibility assessment focus on the ALJ's consideration for his potential for absenteeism before August 31, 2008. That issue has been addressed above and further discussion is not warranted.

### VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of January, 2014.